Chief Judge Ricardo S. Martinez

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR18-217RSM |
| Plaintiff, | |
| v. | GOVERNMENT'S TRIAL BRIEF |
| BRADLEY WOOLARD, ANTHONY PELAYO, and JEROME ISHAM, | |
| Defendants | |

COMES NOW the United States, by and through Tessa M. Gorman, Acting United States Attorney for the Western District of Washington, and Mike Lang and Karyn Johnson, Assistant United States Attorneys for said District, and files this Trial Brief.

## I.       INTRODUCTION

The Fourth Superseding Indictment charges a total of forty-five counts against the three defendants proceeding to trial.

## II.      THE CRIMES CHARGED

The counts can be generally divided into the following five categories:

- Conspiracy to Distribute Controlled Substances

- Substantive drug offenses

- Conspiracy to Commit Money Laundering

- Substantive money laundering offenses

- Firearms offenses

**A. Drug Offenses**

**1. Conspiracy to Distribute Controlled Substances**

All three defendants are charged in Count One—the drug conspiracy count. Count One charges each defendant with Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C.§ 846, alleging specific quantities of fentanyl and furanyl fentanyl. To convict each defendant of this offense, the government must prove: (1) there was an agreement between two or more persons to manufacture or distribute controlled substances; and (2) the defendants joined in the agreement knowing of its purpose and intending to help accomplish that purpose. *See* Ninth Circuit Model Jury Instruction § 9.19 (2010 Edition – updated 6/2019); *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir. 1987), *modified by United States v. Shabani*, 513 U.S. 10 (1994).

In sum, each defendant's role in the drug conspiracy was as follows:

**Bradley Woolard:** He was the mastermind of the drug conspiracy. When his construction and marijuana businesses proved insufficiently lucrative, Woolard began a new, and extremely profitable, enterprise: the manufacture of pills pressed to look like real oxycodone, but which contained potentially deadly fentanyl or furanyl fentanyl. Woolard set this plan into motion in approximately 2015-2016.

Woolard manufactured hundreds of thousands of pills, using pill presses he bought online. He distributed the pills in bulk to his middle-men redistributors (such as Timothy Mantie). In approximately 2017, Woolard delegated the pressing of the pills to his close associate, Anthony Pelayo. But Woolard retained the critical role of ordering the

Government's Trial Brief  - 2
*United States v.Woolard, et al,* CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  shipments from China.  Woolard also directed the activities of his wife, Shawna Bruns,

2  and another close associate, Keith Strand.

3      **Anthony Pelayo:**  He was Woolard's trusted right-hand man. Woolard taught

4  Pelayo how to make fentanyl and furanyl fentanyl pills, and the two men often made pills

5  side by side. Pelayo also played a key role in the wholesale distribution of the pills to his

6  own network of redistributors, including **Jerome Isham**.  Pelayo eventually took over the

7  operation when Woolard decided that pressing pills at his home was too dangerous.

8  Pelayo also directed his own underlings, such as Robert Tabares, instructing them to buy

9  certain tools of their trade online, such as pill presses, chemical additives, and other pill-

10  making supplies.

11      **Jerome Isham**:  Isham is a long-time colleague of Pelayo from the drug trade.

12  Isham was a trusted wholesale buyer of pills from Pelayo. He also recruited third-party

13  accomplices (such as Sadie Bates and Jessie Simmons) to receive the packages of drugs

14  fentanyl from China.

15      **a.  The conspiratorial agreement.**

16      A conspiracy is an agreement to commit an unlawful act. *United States v. Collazo*,

17  984 F. 1308 (9th Cir. 2021); *Ianelli v. United States*, 420 U.S. 770, 777 (1975).  The

18  agreement itself is the offense, and therefore, "it is not necessary for the government to prove

19  that the defendant or other participants committed the unlawful object of the conspiracy."

20  *Collazo,* at 1319.  When the government proves that a defendant had a knowing connection

21  to a drug trafficking enterprise, and had reason to know of its scope, "a factfinder may infer

22  that the defendant agreed to the entire unlawful scheme." *Id.*

23      An agreement constituting a conspiracy may be inferred from the acts of the

24  parties, *see United States v. Fulbright*, 105 F.3d 443, 448 (9th Cir. 1997), such as through

25  evidence of coordinated activity between the defendant and alleged co-conspirators.

26  *United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992), cert. denied, 508 U.S. 913

27  (1993); *accord United States v. Hernandez*, 876 F.2d 774, 778 (9th Cir. 1989). It is not

28  necessary to show that each co-conspirator was aware of <u>all</u> of the details of the

Government's Trial Brief  - 3
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conspiracy or of the parties involved. When one joins an illegal venture, one becomes part of the scheme even if he knows only of his or her own share of wrongdoing. *Blumenthal v. United States*, 332 U.S. 539, 556-57 (1947); *Chavez v. United States*, 275 F.2d 813, 817 (9th Cir. 1960). Indeed, "once a conspiracy exists, evidence establishing beyond a reasonable doubt a defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict the defendant of knowing participation in the conspiracy." *United States v. Delgado*, 357 F.3d 1061, 1066 (9th Cir. 2004).

### b. Criminal liability in a conspiracy.

Once the government has established the existence of a conspiracy, each defendant may be liable for his participation by "evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight. . ." *Collazo,* at 1319; *United States v. Meyers*, 847 F.2d 1408, 1413 (9th Cir. 1988). The government must prove that each defendant "had the 'intent to effectuate the object of the conspiracy.'" *Collazo,* at 1319; *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 433 n. 20 (1978). In this case, the object of the conspiracy was to distribute controlled substances; the government expects to readily prove that each defendant shared this common intent.

### c. Admissible evidence in a conspiracy.

The government will offer many statements (text messages and verbal statements) between the conspirators that discuss a host of conspiracy-related issues, from ordering supplies, to pricing the product, to hiding evidence. This evidence should be admissible as part of the conspiracy. "The rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy . . ." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011); *accord United States v. Montgomery*, 384 F.3d 1050, 1061-62 (9th Cir. 2004) (acts that occurred within the temporal scope of the conspiracy and were inextricably intertwined with the conspiracy are not subject to Rule 404(b) analysis). Moreover, such inextricably intertwined acts are considered direct

Government's Trial Brief - 4
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  evidence of the offense.  *See United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th

2  Cir. 1992).

3       **d.     End Date of the Conspiracy.**

4       The arrest of Isham (in August 208) and Woolard (in September 2018), did not

5  end the conspiracy. The arrest of any member of the conspiracy does not "necessarily

6  signal[] an end to the entire conspiracy . . ."  In fact, officers may ". . . continue to collect

7  evidence proving the existence of the conspiracy after the conspiracy ended." *United*

8  *States v. Aguirre*, 4 Fed. Appx. 370 (9th Cir. 2001). A conspiracy may continue even after

9  the government defeats the conspiracy's object. *See United States v. Jimenez Recio*, 537

10  U.S. 270 (2003). Thus, in this case, the conspiracy charged in Count One continued at

11  least until "on or about June 13, 2019," as the indictment alleges, because law

12  enforcement officers continued to gather evidence, up to and including during the search

13  of Jose Lugo's residence in Marysville on that date.

14       **2.  Substantive drug offenses.**

15       Woolard, Pelayo, and Isham  are charged with possession with intent to distribute

16  controlled substances (fentanyl and furanyl fentanyl), or attempted possession with intent

17  to distribute. (See Appendix A). These counts are based on either (a) drugs found in their

18  residences and/or vehicles; or (b) drugs from China delivered to third parties which the

19  charged defendants coordinated, facilitated, or directed.

20       To convict the defendants of these crimes, the United States must prove beyond a

21  reasonable doubt: (1) the defendant knowingly possessed a controlled substance (or aided

22  and abetted its possession); and (2) he possessed it with the intent to deliver it to another

23  person.  To "possess with intent to distribute" means to possess with intent to deliver or

24  transfer possession of a controlled substance to another person, with or without any

25  financial interest in the transaction.  *See* Ninth Circuit Model Jury Instruction 9.15.

26       **3.  Knowledge of the drugs involved in the conspiracy**

27       A defendant may attempt to assert he is not liable because he did not know the

28  exact nature of the drugs he possessed or distributed. This is not a defense. The Ninth

Government's Trial Brief  - 5
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Circuit has "long recognized the basic rule that a defendant charged with a controlled substance offense 'need not know the exact nature of the substance with which he was dealing,' but 'can be convicted under § 841 . . . if he believes he has *some* controlled substance in his possession.'" *Collazo,* at 12, quoting *United States v. Ramirez-Ramirez*, 875 F.2d 772, 774 (9th Cir. 1989). That will be the case here; it is unlikely any defendant knew the exact chemical composition of what they were selling; they knew it was illegal and they knew it was profitable.

### 4. Drug Quantity Proof.

Virtually all the charged drug offenses specify a drug quantity that, if proved, triggers an enhanced penalty.[1] As this Court is aware, to impose these enhanced penalties, the government must prove beyond a reasonable doubt the amount of controlled substances involved in a particular offense. *See Alleyne v. United States,* 133 S. Ct. 2151, 2155 (2013)*; Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *United States v. Velasco Heredia*, 319 F.3d 1080, 1086 (9th Cir. 2003) (stating that after *Apprendi*, the statutory mandatory minimum sentences under 21 U.S.C. § 841 do not apply "until the jury, or the court in a bench trial, finds beyond a reasonable doubt [ ] the quantity involved in the violation.").

In *Collazo, supra,*  the Ninth Circuit did away with the "reasonable foreseeability" limitation in determining a defendant's liability for the amount of drugs involved in a drug conspiracy.[2] 984 F. 3d at 1315. Thus, in this case, each defendant is responsible for *all the drugs involved* in the conspiracy, regardless of foreseeability, which only becomes relevant for purposes of calculating the defendant's relevant conduct for Guidelines purposes. The government's proposed jury instructions and verdict forms take into account the holding in *Collazo.*

---

[1]  The lone exception is Count 31, charging Jerome Isham for furanyl fentanyl found in his Chevy Trailblazer.
[2]  In *Collazo*, the Ninth Circuit actually reversed the drug conspiracy conviction because the jury instructions included foreseeability language regarding weight.

Government's Trial Brief  - 6
*United States v. Woolard, et al, CR18-217RSM*

The government is also *not* required to prove a defendant knew the specific drug type(s) involved in the conspiracy and/or the drug quantities involved in the overall conspiracy, in order to trigger the statutory penalties. *See United States v. Collazo*, *supra* at 1315.

### 5.  Fentanyl and furanyl fentanyl as controlled substances

Both drugs charged in the indictment are controlled substances. Fentanyl is a Schedule II controlled substance. 21 CFR § 1308.12(c)(9). Furanyl fentanyl (N-(1-phenethylpiperidin-4-yl)-N-phenylfuran-2-carboxamide) is a Schedule I controlled Substance. 21 CFR §  1308.11(b)(38). Furanyl fentanyl was listed as a Schedule I controlled substance, effective November 29, 2016, pursuant to the DEA's temporary emergency scheduling power. 21 C.F.R. § 1308.11(h)(5); Schedule of Controlled Substances: Temporary Placement of Furanyl Fentanyl Into Schedule I, 81 Fed. Reg. 85873-02, 2016 WL 6947861 (Nov. 29, 2016) (codified at 21 C.F.R. § 1308.11(b)(38)).

Because furanyl fentanyl was not controlled during the entire time of the charged conspiracy, the government will provide testimony, explaining to the jury that furanyl fentanyl is an analogue of fentanyl. The Analogue Act defines a controlled substance analogue as a substance which (a) has a chemical structure that is substantially similar to the chemical structure of a controlled substance in Schedule I or Schedule II, (b) has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the effect of a controlled substance on Schedule I or Schedule II, or (c) is represented or intended to have an effect that is substantially similar to a controlled substance in Schedule I or Schedule II. *McFadden v. United States*, 135 S. Ct. 2298, 2304-05 (2015) (quoting 21 U.S.C. § 802[32][A]).

Furanyl fentanyl became a Schedule I controlled substance on November 29, 2016, which was approximately one year into the charged conspiracy. Because furanyl fentanyl is itself a scheduled controlled substance, it is not merely "substantially similar" to a controlled substance, it is one itself. See 21 U.S.C. § 802(32)(C)(i) (indicating that the term "controlled substance analogue" does not include a controlled substance).

Government's Trial Brief  - 7
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Moreover, although furanyl fentanyl cannot be both a scheduled controlled substance and
2   a controlled substance analogue, it can be both a scheduled controlled substance and an
3   analogue of fentanyl. *See United States v. Morrison*, 16-MR-0118, 2016 WL 7421924, at
4   *3 (W.D.N.Y. Dec. 23, 2016) (noting that furanyl fentanyl is a fentanyl analogue); see
5   also Schedules of Controlled Substances: Temporary Placement of Furanyl Fentanyl Into
6   Schedule I, 81 F.R. 66224-01, 2016 WL 5269577 (Sept. 26, 2016) (noting that furanyl
7   fentanyl is a fentanyl analogue). The controlled substance analogue category is
8   essentially a catch-all category to allow prosecution for substances that have not been
9   scheduled but are substantially similar to scheduled substances; it does not state or
10  suggest that analogues of controlled substances can never themselves be controlled
11  substances if Congress or the DEA chooses to schedule them. The fact that a substance is
12  structurally an analogue of another substance does not necessarily make that analogue a
13  "controlled substance analogue."

14          The government will offer testimony as to the chemical and pharmacological
15  similarities between fentanyl and furanyl fentanyl.

16  **B.  Money Laundering Offenses**

17          **1.  Conspiracy to commit money laundering**

18           A conviction for a money laundering conspiracy does not require proof of an
19  overt act. *Whitfield v. United States*, 543 U.S. 209 (2005).  Similar to a drug trafficking
20  conspiracy, the agreement itself is the crime.  That being said, in this case, the
21  government expects the evidence to show many overt acts committed by each charged
22  defendant that furthered each money laundering conspiracy.

23          The Fourth Superseding Indictment charges two counts of money laundering
24  conspiracy:

25          **Count 13: Woolard and Pelayo** (and pled co-conspirators Shawna Bruns, Keith
26  Strand, and Robert Tabares):

27

28

Count 13 alleges a conspiracy to commit international money laundering (transmitting funds to China in payment for the drugs sent to the United States). In this conspiracy, the money laundering can be summarized as follows:

Woolard ordered controlled substances from China. He agreed to pay for the drugs. Woolard and Pelayo coordinated payment. Woolard and Pelayo recruited third parties (Keith Strand, recruited by Woolard, and Robert Tabares, recruited by Pelayo), to wire funds to China as payment for the drugs. Strand and Tabares wired the funds to China using Western Union.  When the Chinese source of supply asked Woolard to use Bitcoin to make a larger payment for a multi-kilo order of fentanyl, Woolard recruited pled co-conspirator Griffin Thompson to make a payment of Bitcoin to the "wallet" identified by the Chinese source.  Pelayo was also scrambling to find Bitcoin to pay for the order.

The government will provide Count 34 through certified business records from Western Union, and through corroborative witness testimony.  The government will also call IRS CI Eric Hergert to testify about some of the Bitcoin transactions in this case.

**Count 35: Anthony Pelayo** (and pled co-conspirator Andrew Tong). Count 35 alleges three alternative forms of money laundering conspiracy:

- a conspiracy to launder the proceeds of unlawful activity (18 U.S.C. 1956(a)(1)(B)(1);
- a conspiracy to launder to avoid a transaction reporting requirement (18 U.S.C. 1956(a)(1)(B)(ii));
- a conspiracy to launder the proceeds of a drug trafficking conspiracy (18 U.S.C. 1957)

The government will prove the existence of this money laundering conspiracy through bank records, physical items (such as cash and Pelayo's recreational vehicle), and text messages and conversations.

Government's Trial Brief  - 9
*United States v. Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      **2.   Substantive money laundering crimes.**

2         Similar to the money laundering conspiracies, the indictment alleges several

3      substantive money laundering counts, which can be grouped as follows:

4         **Counts 14-27 (Woolard and Pelayo):**  These counts involve specific Western

5         Union wire transfers to China as payment for controlled substances

6         **Count 36 (Pelayo):** This count involves Pelayo's purchase of an RV with drug

7         trafficking proceeds, and using convicted co-conspirator Andrew Tong as his

8         middleman.

9         **Count 37 (Pelayo):** In this count, Andrew Tong deposited $100,000 into Pelyo's

10        bank account, which consisted of drug proceeds Tong had laundered for Pelayo.

11        **Counts 38-43 (Pelayo):** These six counts involve Andrew Tong wiring money

12        back into Pelayo's bank account, after Tong had sought to make the funds look

13        legitimate.

14        **Counts 44-45 (Pelayo**): These counts involve two wire transfers of $100,000 from

15        Pelayo to Tong, which Pelayo made in hopes that Tong would launder the funds

16        for him.

17     C.  **Firearms Offenses**

18        **1.   Possession of a Firearm in Furtherance of a Drug Trafficking Crime.**

19     Three defendants have been charged with violations of 18 U.S.C. § 924(c)(1)(A):

20        **Bradley Woolard** (Count 9) (33 guns recovered from his home on August 20,

21     2018)

22        **Anthony Pelayo** (Count 11) (one gun recovered from his van on May 30, 2019)

23     and (Count 12) (12 guns recovered from his home on May 30, 2019)

24        **Jerome Isham** (Count 33) (one gun recovered from his residence on August 3,

25     2018)

26        The elements of this offense are: (1) the defendant committed the crime of

27     Conspiracy to Distribute Controlled Substances, as charged in Count 1 of the indictment;

28     (2) the defendant knowingly possessed the specific firearm(s); and (3) the defendant

Government's Trial Brief - 10
*United States v.Woolard, et al*, CR18-217RSM

possessed the firearm in furtherance of the drug crime charged. Ninth Circuit Model
Criminal Jury Instruction - 8.72.

The government anticipates that each defendant will challenge these offenses on
various grounds, including, perhaps, that the gun(s) were not possessed "in furtherance
of" the drug trafficking offense charged. In *United States v. Krouse*, 370 F. 3d 965 (9th
Cir. 2004), the Court reviewed a similar challenge.  The Ninth Circuit declined to adopt a
particular test or checklist to determine when a firearm is possessed in furtherance of the
drug trafficking offense; rather, it held, ". . . sufficient evidence supports a conviction
under § 924(c) when facts in evidence reveal a nexus between the guns discovered and
the underlying offense." 370 F. 3d at 968 (emphasis supplied).  In *Krouse,* the Court
found "ample evidence" that the guns were possessed in furtherance of the crime,
because several high caliber guns were "strategically located within easy reach" of drugs
and drug paraphernalia. *Id.* The Court took note of other cases affirming such convictions
where guns were "quickly and easily available for use," where there was close proximity
of the weapons to drugs, and where the guns were loaded. *Id.*

For each defendant, this evidence will be slightly different.

**Woolard**: The evidence will show that Woolard acquired the majority of his
firearms, including assault rifles, handguns, and hunting rifles, from co-defendant Jose
Lugo, in approximately March 2018, at the peak of his drug conspiracy.

Woolard stored the weapons in two places: first, in the attic of his primary
residence, which had a hatch in the ceiling, which was in Woolard's home office. In this
office, investigators found drugs and cash. Testimony will show this office was where
Woolard regularly stored fentanyl and furanyl fentanyl pills for sale. Thus, the six hidden
firearms  were readily accessible to him and in close proximity to where he stored drugs.

Agents also found 27 firearms in one of the outbuildings on Woolard's property.
One of these was a shotgun, easily accessible but hidden behind a water heater. The
remainder of Woolard's weaponry was cleverly concealed  behind a false wall, in a
hidden room. This workshop/apartment was in an outbuilding on his primary residential

Government's Trial Brief  - 11
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    property. This outbuilding is where Woolard had operated his past marijuana grow, and

2    which he used for pressing pills in this conspiracy. Agents found thousands of rounds of

3    ammunition for these firearms, hidden inside the drywall of the ceiling of the

4    workshop/apartment. Agents also found $100,000 cash in this same shed. These firearms

5    were concealed, but easy to grab in the event of "drug rip," or other significant event.

6          Equally significant, and as explained in other pleadings, is Woolard's possession

7    of silencers. One of the guns was equipped with a silencer, another gun had a silencer in

8    its carrying case, and two other silencers were found with the guns (for a total of four

9    silencers). These facts suggest the guns were planned for a nefarious use, and not simply

10   for hunting or some other legal purpose. Courts have recognized that that "a silencer

11   transforms an unmuffled gun into a far more threatening weapon." *United States v.*

12   *Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir.1990), *cert. denied*, 499 U.S. 924 (1991), and that

13   "the only purpose of a silencer-equipped firearm is stealth—to kill without warning,

14   commotion or detection. It adjusts the calculus of risks and rewards for the user in a way

15   that makes the gun more dangerous to a potential victim." *United States v. Santos*, 64 F.

16   3d 41, 46 (2d. Cir. 1995).

17         Of importance as well in Woolard's case are text messages from September 2013

18   in which he discusses using a firearm to threaten others he believed had wronged him in

19   past drug deals. These corroborate that he possessed the firearms with an intention to

20   intimidate rivals and ensure his drug profits were not stolen from him.

21         **Pelayo**: Agents found guns in the following locations:

22         **Count 11:** (Pelayo's van) Agents found a single 9 mm, loaded handgun in the

23   console of Pelayo's van, readily accessible and close to cash. Pelayo used this van for his

24   drug dealing activities. He admitted in text messages he kept "heat" nearby during his

25   drug deals (see below).

26         **Count 12** (firearms in his residence):  Inside Pelayo's home, agents found twelve

27   firearms: one loaded 9 mm semi-automatic handgun on the top of the refrigerator; two

28

Government's Trial Brief  - 12
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  loaded handguns in a safe in the master bedroom; and nine guns (two handguns and

2  seven rifles) in a safe in his garage.

3       As to the firearms in his home, evidence from co-conspirators and text messages

4  will show that Pelayo had  had thousands of dollars in cash in his kitchen drawers, thus

5  corroborating this room was used either to store drug proceeds, and/or to conduct drug

6  transactions. The gun on top of the refrigerator was close to one of the primary entrances

7  of his home. The evidence at trial will also include texts between Pelayo and Tong in

8  which Pelayo wrote that he was going to show "heat" to drug buyers who were

9  demanding their money back (because the drugs he sold to them were of allegedly poor

10  quality). Other text messages corroborate Pelayo's use of a gun during drug deals and his

11  knowledge of the inherent dangers of drug trafficking.

12       **Jerome Isham:**  Agents found one 9 mm pistol, unloaded, but in a carrying case,

13  which case also contained a fully loaded magazine, in the master bedroom of Isham's

14  home. The gun was within easy reach of drugs and drug paraphernalia: agents found

15  several bags of distribution-quantity furanyl fentanyl in a drawer of his bedside

16  table/nightstand, and a box of several hundred furanyl fentanyl tablets in his master

17  bedroom closet. The agents also found several white boxes, used to store drugs, in the

18  bedroom closet.

19       As to all defendants, the government expects to offer testimony that drug

20  traffickers possess firearms to protect their drugs and proceeds (during deals and in their

21  storage locations), and because drug trafficking is often a cash business.

22       **2.  Felon in Possession of a Firearm.**

23       **Jerome Isham** (Count 32) is charged with being a felon in possession of firearms,

24  in violation of 18 U.S.C. § 922(g)(1).  To convict a defendant of this charge, the

25  government must prove: (1) the defendant possessed the firearm in question; (2) the

26  firearm had been shipped or transported in interstate or foreign commerce; and (3) at the

27  time the defendant possessed the firearm, the defendant knew he had been convicted of a

28  crime punishable by imprisonment for a term exceeding one year.  Ninth Circuit Model

Government's Trial Brief  - 13
*United States v. Woolard, et al,* CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Criminal Jury Instruction 8.63; *Rehaif v. United States,* __ U.S. __, 139 S. Ct. 2191 (2019).

The government will prove the prior felony convictions using certified court records, if necessary (i.e., if not stipulated).

As to the interstate nexus, the government is prepared to prove, via the testimony of an ATF special agent, that each defendant's firearms were shipped or transported in interstate or foreign commerce. The government's burden on the interstate nexus element is slight. The government is required to prove only that the firearm traveled in interstate or foreign commerce at some point in time. *Scarborough v. United States*, 431 U.S. 563, 575 n.11 (1977). The shipment or transportation in interstate commerce need not be recent. *United States v. Casterline*, 103 F.3d 76, 77 (9th Cir. 1996). Testimony that a firearm is not manufactured in the state where the defendant possessed it is sufficient to meet the government's burden. *United States v. Alvarez*, 972 F.2d 1000, 1002 (9th Cir. 1992). All of the guns involved in this case, as to all defendants, were manufactured out of state.

### 3.   Unlawful User of Controlled Substances in Possession of a Firearm

Bradley Woolard is charged in Count 8 with being an unlawful user of a controlled substance in possession of a firearm. To convict the defendant of this offense, the government must prove beyond a reasonable doubt: (1) the defendant knowingly possessed, one or more of the firearms specified in the indictment; (2) the firearm(s) had been shipped or transported from one state to another or between a foreign nation and the United States; and (3) at the time the defendant possessed the firearm, the defendant knew he was addicted to a controlled substance, or knew he was an unlawful user of a controlled substance. Ninth Circuit Model Jury Instruction – 8.65.

An unlawful user of a controlled substance is someone who ingests drugs regularly, over an extended period of time, or who habitually ingests a controlled substance, in a manner other than as prescribed by a physician, and contemporaneously with his purchase or possession of a firearm. *United States v. Purdy*, 264 F.3d 809, 812-13 (9th

Government's Trial Brief  - 14
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Cir. 2001); *United States v. Cook*, 970 F.3d 866, 874, 880-81 (7th Cir. 2020); *United*
2    *States v. Yancey*, 621 F. 3d 681, 682 (7th Cir. 2010).

3         In Count 8, Woolard is charged with possessing these firearms "beginning at a
4    date unknown but at least by July 27, 2018," (when he bought the guns from Jose Lugo),
5    and until August 19, 2018 (when DEA agents founds the guns in Woolard's house).  The
6    evidence will show that during the time period Woolard possessed these guns, he was an
7    unlawful user of, and likely addicted to, oxycodone and other drugs.  In fact, he was so
8    addicted to these drugs that he voluntarily committed himself to a spa-like drug treatment
9    facility in Mexico, known as "The Holistic Sanctuary," in early 2017, and again on
10   August 7, 2018.  He remained at this facility until September 1, 2018.

11              **4.   Unanimity in firearms offenses.**

12        In a 922(g) or 924(c) case involving multiple firearms, juror unanimity about the
13   particular firearm is not required.  As long as all the jurors agree that at least one charged
14   firearm was possessed/possessed in furtherance of drug trafficking, they do not have to
15   agree about the particular firearm in order to convict. *See United States v. Ruiz,* 710 F.3d
16   1077, 1081–82 (9th Cir. 2013).

17   **III.   EVIDENTIARY ISSUES**

18   **A.    Statements of Co-Conspirators**
19
20        The government expects to introduce text messages between the defendants/co-
21   conspirators, and expects several witnesses will testify to statements made by the
22   defendants and other coconspirators in furtherance of the conspiracy. These statements
23   are not hearsay, and are admissible against *all* of the defendants under Federal Rule of
24   Evidence 801(d)(2)(E), which provides:

25
26
27
28

Government's Trial Brief  - 15
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

> A statement is not hearsay if . . . [t]he statement is offered
> against a party and is . . . a statement by a coconspirator of
> a party during the course and in furtherance of the conspiracy.

*See also United States v. Fielding*, 645 F.2d 719, 725 (9th Cir. 1981); *United States v. Weiner*, 578 F.2d 757, 768-69 (9th Cir. 1978).

Statements made to keep co-conspirators abreast of an ongoing conspiracy's activities satisfy the "in furtherance of" requirement. *United States v. Eaglin*, 571 F.2d 1069, 1083 (9 Cir. 1977); *United States v. Moody*, 778 F.2d 1380, 1382 (9th Cir. 1985) *amended at* 791 F.2d 707 (9th Cir. 1986) (statements made to 'higher ups' of the group are in furtherance); *United States v. Yarbrough*, 852 F.2d 1522, 1535-36 (9th Cir. 1988); *United States v. Andersson*, 813 F.2d 1450, 1456 (9th Cir. 1987). Statements in furtherance of the conspiracy are statements made to induce continued participation prompt further action, *Eaglin*, *supra* at 1083; *United States v. Echeverry*, 759 F.2d 1451, 1457 (9th Cir. 1985), *United States v. Kendall*, 665 F.2d 126, 133 (7th Cir. 1981); to allay fears, *United States v. Layton*, 720 F.2d 548, 557 (9th Cir. 1983); to explain coconspirators' roles, *Moody*, 778 F.2d at 1383; or aim to avoid detection, *United States v. Eubanks*, 591 F.2d 513, 521 n.7 (9th Cir. 1979).

To lay a foundation for the admission of a co-conspirator's statement, the government must present a prima facie case of the existence of a conspiracy, and the defendant's connection to the conspiracy, however slight. *United States v. Batimana*, 623 F.2d 1366, 1368 (9th Cir. 1980). In *Bourjaily v. United States*, 483 U.S. 171, 179-83 (1987), the Supreme Court stated the quantum of proof required to establish the conspiracy is a preponderance of the evidence, and that the statement itself may be considered, along with other evidence, in determining the existence of conspiracy. *Id.* at 173-73. The prosecution, therefore, need not establish the conspiracy, or the defendant's membership in that conspiracy, before presenting a co-conspirator's statements to the jury. In the court's discretion, the statements may be introduced subject to later

Government's Trial Brief - 16
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  connection. *Batimana*, 623 F.2d at 1369. This procedure ensures a coherent and efficient
2  presentation of evidence.

3  As to the reliability of the statement, the *Bourjaily* Court held that the
4  co-conspirator exception to the hearsay rule is a "firmly rooted exception," and no further
5  proof of indicia of reliability is necessary for the admission of a coconspirator's
6  statement. 483 U.S. at 182-83; s*ee also United States v. Smith*, 893 F.2d 1573, 1579 (9th
7  Cir. 1990) ("[T]he confrontation clause does not require a court to embark on an
8  independent inquiry into the reliability of statements that satisfy the requirements of Rule
9  801(d)(2)(E)") (citing *Bourjaily*). The Supreme Court's decision in *Crawford v.*
10  *Washington*, 541 U.S. 36 (2004) did nothing to disturb this principle, the Court
11  specifically stating that "statements in furtherance of a conspiracy" are reliable,
12  nontestimonial, and not subject to Confrontation Clause protections. *Id.* at 543-44.
13  All parties to a conspiracy need not be named in the indictment. *Ng Pui Yu v. United*
14  *States*, 352 F.2d 626, 633 (9th Cir. 1965). The evidence may establish that other
15  persons were involved in the conspiracy but have not been charged. Acts and
16  declarations of persons not named in the indictment made in furtherance of the
17  conspiracy are admissible as to all named conspirators.

18  **B.    Dominion and Control Documents**

19  The government intends to offer documents into evidence that were found in the
20  residences and vehicles of the defendants. These documents will be offered to show
21  dominion and control over the residences and vehicles.  They will not be offered to prove
22  the truth of the matter asserted on the documents, and therefore, they are not hearsay.
23  Fed. R. Evid. 801(c).

24  Separate and apart from the dominion and control documents, the government will
25  offer motor vehicle registrations (for Isham and Pelayo's vehicles) for the truth of the
26  matter asserted, because these documents are reliable and were adequately authenticated
27  because they were found in the respective motor vehicles to which they relate. *See e.g.,*
28  *United States v. Anguiano*, 927 F.2d 610 (9th Cir. 1991) (affirming trial court's admission

Government's Trial Brief  - 17
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of vehicle registration documents because they "had been adequately authenticated by the fact of being found in the van—a place where they would usually be found.").  The government may also offer the defendants' driver's licenses for the truth of the matter, because they are reasonably reliable.

## C.      Past possession of Firearms and Drugs to Prove Knowledge and to Rebut any claim of "Innocent Ownership."

### *Proof that Isham Knew he Could Not Possess Firearms*

The government hopes to achieve a stipulation with Mr. Isham that he knew he could not possess firearms. Absent such stipulation,  the government will seek to offer his 2012 conviction in its chief to prove he knew he could not possess firearms, evidence relevant to   Count 32 (Felon in Possession of a Firearm). Absent stipulation, the government will offer a certified copy of Isham's plea statement from his 2012 case, where he admits he knew it was unlawful for him to possess a firearm.

## IV.     POTENTIAL TRIAL ISSUES

## A.     Opinion Testimony

The government expects to offer the following witnesses pursuant to Fed. Rule Evid. 701, absent stipulation as to any of these issues:[3]

• **Forensic Chemical Analysis:** The government may  call approximately ten DEA forensic chemists, who will testify regarding the drug analysis in this case, including the presence of controlled substance(s), drug quantities, such as gross and net weights, and the purity/amount of the actual drugs found.

• **Expert Testimony Regarding Fentanyl and Fentanyl Analogues (furanyl fentanyl)**: A Drug Science Specialist will testify regarding the chemical composition of fentanyl and that furanyl fentanyl is an analogue of fentanyl.

---

[3]  The government has sought to limit the need for expert testimony through stipulation. This has proved to be a false hope. Nevertheless, some of these experts may not be called depending on the nature of the defense(s) presented.

Government's Trial Brief  - 18
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  **• Firearms / Ammunition Examination –** Special Agents from the Bureau of

2  Alcohol, Tobacco, Firearms and Explosives (ATF) may testify regarding firearms and

3  ammunition seized in this case, including the functionality of the firearms, and that each

4  charged firearm was manufactured outside the State of Washington and therefore was

5  transported in interstate or foreign commerce

6  **• Drug Trafficking Modus Operandi –** A DEA Special Agent will offer

7  testimony about the modus operandi of drug trafficking organizations, and in particular,

8  illicit pill press operations. The hallmark of a conspiracy is concerted activity.  "The

9  federal courts uniformly hold . . . that government agents . . . may testify as to the general

10  practices of criminals to establish the defendant's modus operandi" in conspiracy cases.

11  See United States v. Johnson, 735 F.2d 1200, 1202 (9th Cir. 1984); United States v.

12  Patterson, 819 F.2d 1495, 1507 (9th Cir. 1977); United States v. Andersson, 813 F.2d

13  1450, 1458 (9th Cir. 1987) (testimony regarding trafficking methods and counter-

14  surveillance).

15  His testimony that will help explain: some of the terms found in text messages

16  between the conspirators (e.g., "blues" and "percs" refer to counterfeit M30s); how and

17  why drug traffickers use pill presses; the difficulties associated with investigating such

18  operations (including the dangers associated with the drugs); the profits generated by

19  such operations (to explain the source of the illicit cash found in this case, and

20  corroborate the money laundering aspects); common methods of distribution and sale;

21  the use of recipes, ledgers, and pay/owe sheets; and what items are commonly used to

22  facilitate drug trafficking, to include scales, baggies, packaging materials, and weapons.

23  The witness further will testify that drug distribution is typically a cash business,

24  that drug distributors often maintain, transport, and/or store large amounts of cash.

25  Because this is a cash business, drug traffickers will also  possess firearms and

26  ammunition, to protect their currency, to protect themselves during drug deals, and to

27  protect their drugs. The Ninth Circuit has allowed such testimony as either expert or lay

28  testimony. *See e.g., United States v. Flores*,  536 Fed.Appx. 709 (9th Cir. 2013) (allowing

Government's Trial Brief  - 19
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   drug detective to testify as a lay witness regarding why drug traffickers keep and store

2   firearms).

3      **Valuation/Appraisal Testimony:** A Deputy US Marshal will testify to the value

4   of the gold seized from Woolard's home.

5      • **Chinese Language Translation:** A certified Chinese translator will offer

6   English translation from Chinese script found on various items of evidence, including (a)

7   shipping labels seized in this case; (b) photos of communications between Woolard and

8   his Chinese sources of supply; (c) portions of emails between Woolard and his Chinese

9   sources of supply, particularly the Chinese language found in the email headers (sender,

10  recipient, date, subject line).

11  • **Pill Press Functioning:** A DEA Special Agent will testify how a "tableting

12  machine," or "pill press," operates, and the processes used to make illicit drug tablets. He

13  will discuss definitional terms in the pill-making process, parts of pill presses, types of

14  pill presses (including the types used in this case), the hazards of loose powders, DEA

15  Guidance regarding presses, federal laws related to presses, ingredients used to make

16  illicit pills, and other related topics, such as items used in the manufacture of pills,

17  including grinders and mixers. The government will request the court's permission to

18  bring a pill press into the courtroom so the witness can demonstrate the pill-making

19  process using an actual pill press; we expect him to use powders and dyes to make pills in

20  the courtroom (with the court's permission). We will also present a video and still photos

21  of this process.

22  • **Summary Witness:** The government will call a summary witness to testify to the

23  financial records of Woolard and Pelayo, as well as to the financial records of accounts

24  that were associated with or interacted with accounts of Woolard or Pelayo. She will

25  testify to money flows into and out of their bank accounts, and she will summarize their

26  reported income (via tax records) as compared to their bank records and expenditures

27  based on bank, property, credit, and other records.

28

Government's Trial Brief  - 20
*United States v. Woolard, et al,* CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B. Photographs of Lay Witnesses**

Due to the anticipated length of this trial (approximately three to four weeks), the government may seek to offer photographs into evidence depicting some of the civilian witnesses to be called at trial. The government may rely on these photographs during closing argument in order to assist the jury in recalling the testimony of these witnesses, or for purposes of reminding the jury of who were charged and uncharged co-conspirators. The government has been pre-marking the driver's license photos of these witnesses as exhibits for use at trial.

Other courts have recognized the value of this practice in a lengthy trial. *See United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005). In *Johnson*, the government sought permission to mount photographs of witnesses during closing arguments. The government pointed out that the trial was likely to last more than three months, and the parties were likely to call more than seventy-five witnesses. The government proposed offering witness photographs as both summary and demonstrative exhibits. The defense objected to the introduction of the photographs, arguing that it demonstrated the supposed "strength" of the government's case. The district court approved the use of the photographs as demonstrative exhibits at trial:

> . . . The court concludes that use of the photographs of witnesses as demonstrative exhibits is permissible during *both* the trial and the jury's deliberations . . . It is perhaps during deliberations that jurors would be most assisted in recalling the testimony of particular witnesses by having the opportunity to see photographs of those witnesses.

*Id.* at 1062-63.

The Court noted that if any "marginal prejudice" existed, it could be mitigated by the Court providing the witnesses' photographs, and by ". . .providing an instruction that the witness's testimony, not their appearance or numbers, is the evidence before the jury." *Id*. at 1062.

Government's Trial Brief  - 21
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      The government does not believe that any prejudice  will accrue to the admission

2   of these photographs. However, if the Court believes that any proposals such as those in

3   *Johnson* are necessary, the government has no objection to such remedial measures.

4   ### C.  Recall of Witnesses

5      The government requests the court's permission to recall certain DEA agents

6   during trial. If permitted, the government intends to limit this to one or two witnesses,

7   specifically, the primary case investigators (DEA Special Agent Joe Cheng, and possibly

8   DEA Special Agents Ryan Smith or Kris Burford). The government believes calling

9   these witnesses at separate stages of the trial (to discuss search warrants and other case

10  investigation, for example) will assist the chronological flow and logic of the case

11  presentation. This would be particularly helpful in a case of this nature, which will last

12  several weeks, and involves a multi-year conspiracy and scores of witnesses.

13  ### D.  Pill Press as a Demonstrative Aid

14     The government may seek the court's permission to bring into the courtroom one

15  "pill press," a device used to manufacture pills, which is very similar to the pill presses[4]

16  used by defendants Woolard and Pelayo to turn illicit chemicals into pills during the

17  charged conspiracy. The government is currently assessing the viability of doing so,

18  including whether a pill press is available at the time of trial. The government would use

19  this exhibit with its pill press expert (above). The government believes allowing the jury

20  to see and understand the pill press and how it functions will assist the jury in

21  understanding the conspiracy in a manner photographs or videos cannot duplicate.  The

22  government would also ask the court to permit the government's expert witness to come

23  down from the witness stand into the gallery, and review the pill making process using

24  this demonstrative aid

25

26

27  _____

28  [4]  The government will present evidence that the defendants used multiple  pill presses during the course of this conspiracy. Reportedly, the first two broke due to overproduction. Defendant Woolard ordered the last one destroyed after he learned of law enforcement's investigation in this case.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   The pill press the government would seek to use as a demonstrative aid has been
2   used by law enforcement agents for training purposes, and has thus proved itself to have
3   educational and instructive value. The government believes there may be no better
4   method for explaining how a pill press operates than showing the jury themselves, in the
5   courtroom, so the jury can see and understand how the conspirators went about their
6   work.

7   The use of demonstrative aids such as this rests within the sound discretion of the
8   trial court. *United States v. Hernandez*, 109 F.3d 1450, 1452; (9th Cir. 1997); *United*
9   *States v. Cox*, 633 F.th 2d 871, 874-875 (9th Cir. 1980).  Based on the rationale outlined
10  above, the government believes there is a good faith basis to allow the use of the pill
11  press as a demonstrative aid.

12  **E.      Summary Witness, Charts and Summary Schedules**

13  Three types of summaries and charts are typically used in criminal cases:
14  (1) summaries of voluminous records which may be admissible pursuant to Fed. R. Evid.
15  1006; (2) summaries of a summary expert which may be admitted pursuant to Fed. R.
16  Evid. 611(a); and (3) demonstrative or pedagogical charts that are used as testimonial
17  aids, but which are not themselves introduced into evidence.

18  The government intends to use and offer several summary charts as evidence at
19  trial.  These charts will be offered through various federal law enforcement witnesses,
20  including Forensic Analyst Becky Carnell and DEA Special Agent Joe Cheng. The charts
21  summarize or highlight other exhibits and are intended to assist the jury in understanding
22  voluminous evidence and materials.  These witnesses will testify to receiving and
23  reviewing underlying bank records and other financial records and will use summary
24  charts of certain transactions culled from thousands of records.  Special Agent Cheng will
25  also testify to receiving and reviewing thousands of emails between Woolard and sources
26  of supply, including, most prominently, "Mary," a Chinese source of supply who used the
27  email addresses mary-ytchem@hotmail.com and greenchem201609@hotmail.com.
28

Government's Trial Brief  - 23
*United States v.Woolard, et al,* CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Rule 611, addressing the Mode and Order of the Interrogation of Witnesses, gives

2 the Court great discretion in what a witness may use during testimony.  Use of charts by a

3 summary witness using other admissible evidence is allowed if it assists the jury and

4 renders the presentation of information clearer.  *United States v. Olana*, 62 F.3d 1180,

5 1204 (9th Cir. 1995).  The substantive content must be authenticated, but that may be

6 done by the summary witness, if the witness has reviewed the underlying evidence.  Fed.

7 R. Evid. 901; *United States v. Soulard*, 730 F. 2d 1291, 1299 (9th Cir. 1984).  Moreover,

8 as explained below, Rule 1006 allows for the summaries of voluminous materials to be

9 admissible and used as substantive evidence, rather than solely as demonstrative

10 evidence.  *See United States v. Meyers*, 847 F.2d 1408, 1411-12 (9th Cir. 1988)

11 (admitting summary of otherwise admissible evidence as substantive evidence where the

12 summary contributed to the clarity of the presentation).

13    **1.    Fed. R. Evid. 1006: Summary Schedules**

14    Summaries and charts of voluminous records are used to present evidence of

15 records so voluminous as to be impractical or impossible to actually bring into court and

16 use during trial.  *See* Fed. R. Evid. 1006; *United States v. Johnson*, 594 F.2d 1253, 1255

17 (9th Cir. 1979) ("The purpose of Rule 1006 is to allow the use of summaries when the

18 volume of documents is so large as to make their use impractical or impossible."), *cert.*

19 *denied*, *Ritchey v. United States*, 444 U.S. 964 (1979).  The underlying records used to

20 prepare Rule 1006 summaries are not usually admitted into evidence although they can

21 be.  Proponents must lay a proper foundation for admissibility of underlying records.  *See*

22 *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989); *United States v. Meyers*,

23 847 F.2d 1408, 1411 (9th Cir. 1988); *United States v. Johnson*, 594 F.2d 1253, 1254 57

24 (9th Cir. 1979); *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979).  Moreover,

25 the records must be made available to defense in advance of trial.  *Paddack v. Dave*

26 *Christensen, Inc.*, 745 F.2d 1254, 1261 (9th Cir. 1984).

27

28

Government's Trial Brief  - 24
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Summaries of voluminous records introduced pursuant to Fed. R. Evid.1006 are

2    themselves the evidence and are therefore admissible at trial.  *See  United States v. Baker*,

3    10 F.3d 1374, 1411 (9th Cir. 1993) ("[T]his Circuit has often allowed the use of summary

4    charts and summary witness testimony based on testimonial evidence (most commonly in

5    tax cases)");  *United States v. Nordby*, 225 F.3d 1053 (9th Cir 2000); *United States v.*

6    *Wood*, 943 F.2d 1049, 1053 (9th Cir. 1991).

7         The government will offer into evidence summaries of voluminous text messages,

8    e-mails, bank records, and other financial records. The records supporting these

9    summaries are routinely kept by the businesses which stored them in the normal course of

10   business, and fall within the hearsay exception of Rule 803(6).  The underlying records

11   and records certifications have been provided to the defense.

12        **2.    Fed. R. Evid. 611(a): Summary Testimony & Schedules**

13        Rule 611(a) of the Federal Rules of Evidence authorizes the court to "exercise

14   reasonable control over the mode...of...presenting evidence so as to (1) make the...

15   presentation effective for the ascertainment of the truth, [and] (2) avoid needless

16   consumption of time."  Fed. R. Evid. 611; *see United States v. Gardner*, 611 F.2d 770,

17   776 (9th Cir. 1980) (summary chart admissible in tax evasion case under Rule 611(a));

18   *United States v. Paulino*, 935 F.2d 739, 752 54 (6th Cir. 1991) (testimony of nonexpert

19   summary witness regarding cash generated from cocaine sales in drug conspiracy case

20   admissible under Rule 611(a) where trial court gave limiting instruction and defense had

21   full opportunity to cross examine); *United States v. Scales*, 594 F.2d 558, 563 64 (6th Cir.

22   1979) (summaries of testimonial evidence designed "to aid the jury in its examination of

23   the evidence already admitted" do not come within Rule 1006, but are authorized by Rule

24   611(a)), 5 Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence,  (summary

25   "prepared by a witness from his own knowledge to assist the jury in understanding or

26   remembering a mass of details is admissible, not under Rule 1006, but under such general

27   principles of good sense as are embodied in Rule 611(a)").

28

Government's Trial Brief  - 25
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       The government intends to offer a number of summary charts during its case-in-

2   chief.  These summaries will be based on evidence admitted during the trial.  Such

3   summaries themselves can also be properly admitted into evidence.  *See, e.g., United*

4   *States v. Shirley*, 884 F.2d 1130, 1133 34 (9th Cir. 1989).  In *Shirley*, the summary expert

5   witness compiled a summary of telephone records based on information already

6   introduced into evidence.  "Summary evidence..., 'can help the jury organize and

7   evaluate evidence which is factually complex and fragmentally revealed in the testimony

8   of the multitude of witnesses.'"  *Shirley*, 884 F.2d at 1133 34, citing *United States v.*

9   *Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983); see also *United States v. Meyers*, 847 F.2d

10  1408, 1412 (9th Cir. 1988) (properly admitting chart detailing long distance calls made

11  by various coconspirators); *United States v. Marchini*, 479 U.S. 1085 (1987) (admitting

12  summary calculations of IRS agent where he was cross-examined on his testimony).

13      The use of summary expert witnesses has long been approved by the courts.

14  *United States v. Johnson*, 319 U.S. 503, 519 20 (1943) (reversing Court of Appeals and

15  concluding that summary witness's testimony was admissible in a tax evasion

16  prosecution).  The introduction of an expert summary witness and summary schedules

17  has been approved by the Ninth Circuit in tax cases.  *See United States v. Marchini*,  479

18  U.S. 1085 (1987);*Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986).  *See*

19  *also United States v. Voorhies*, 658 F.2d 710, 715 (9th Cir. 1981) ("[T]he fact of a tax

20  due and owing may be established by documentary evidence of tax liability, accompanied

21  by a summary by an expert").  "The nature of a summary witness testimony requires that

22  he draw conclusions from the evidence presented at trial."  *United States v. Esser*, 520

23  F.2d 213, 218 (7th Cir. 1975).  *United States v. Baker*, 10 F.3d 1374, 1411 (9th Cir. 1993)

24  ("[T]his Circuit has often allowed the use of summary charts and summary witness

25  testimony based on testimonial evidence (most commonly in tax cases)"), *cert. denied*,

26  513 U.S. 934 (1994), *overruled on other grounds*, *United States v. Nordby*, 225 F.3d

27  1053 (9th Cir 2000).

28

Government's Trial Brief  - 26
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

### 3. Demonstrative Charts

2      The government also intends to use various demonstrative charts during its

3 opening statement, examination of witnesses, and in closing argument. These will

4 include, for example, charts showing the various stages of the conspiracy.  The

5 government does not intend to offer these charts into evidence.  Courts have repeatedly

6 allowed use of charts similar to those the United States intends to use in this case.  *See,*

7 *e.g., United States v. Scales*, 594 F.2d 558, 561 562 (6th Cir. 1979) (summary of

8 indictment); *United States v. Jennings*, 724 F.2d 436, 441 443 (5th Cir. 1984)

9 (compilation of 200 pages of material involving substantial amount of mathematical

10 calculations), *cert. denied*, 467 U.S. 1227 (1984); *United States v. Stephens*, 779 F.2d

11 232, 238 (5th Cir. 1985) (simple flow charts tracing the Defendant's use of loan

12 proceeds).

13      The Ninth Circuit has determined that courts should take three precautionary

14 measures when demonstrative charts are used: (1) carefully examine the charts out of the

15 presence of the jury to determine if the information contained in them is supported by

16 proof.  *United States v. Soulard*, 730 F.2d at 1292; *United States v. Abbas*, 504 F.2d 123,

17 125 (9th Cir. 1974); (2) allow the charts to be used as testimonial aids for witnesses and

18 visual aids for counsel in argument, but not admit the charts in evidence or allow their

19 use during jury deliberation, *Abbas*; and (3) instruct the jury that the charts are an

20 explanation of other evidence and not proof per se.  The jury should be told the charts are

21 presented as a matter of convenience and if found to be inaccurate they should be

22 disregarded entirely.  *Id.*

23

24

25

26

27

28

Government's Trial Brief  - 27
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

DATED this 6th day of July 2021.

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*/s/ Michael Lang*
MICHAEL LANG
KARYN JOHNSON
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

Government's Trial Brief  - 28
*United States v.Woolard, et al*, CR18-217RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970